**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO
The Honorable A. Bruce Campbell**

| | | |
|---|---|---|
| In re: | ) | |
| SCRUBS CAR WASH, INC. | ) | Case No. 12-31204 ABC |
| EIN: 84-1455615 | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER DENYING CONFIRMATION OF DEBTOR'S CHAPTER 11 PLAN

1. The Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1334(a) and (b) and 28 U.S.C. §§ 157(a) and (b)(1). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L), as it concerns Debtor's application to confirm its Third Amended Plan of Reorganization Dated April 29, 2013, as filed October 18, 2013 (Docket #145) and as amended January 20, 2014 (Docket #179) (the "Plan"), and the objection to confirmation of the Plan filed by First Citizens Bank & Trust Company on January 3, 2014 (Docket #170). I will refer to the objector, First Citizens as "the Bank" and the Debtor as "the Debtor."

2. The Plan creates six classes of creditors with a seventh class being the holder of 100% of Debtor's stock, its president and CEO, Mike Snow. The Bank, who is the Debtor's principal secured creditor, is Class 3 in the Plan and is the only impaired class that has voted against the Plan. The Bank's claim constitutes more than 90% of the Debtor's total debt, and the Bank's is the only outstanding objection to confirmation of the Debtor's Plan.

3. The Bank's objection argues that the Debtor's Plan cannot be confirmed on three separate grounds: First, that the Plan fails to comply with the provisions of Chapter 11 as required by § 1129(a)(1) – – specifically the provisions of § 1129(a)(8)(A) and §§ 1129(b)(1) and 1129 (b)(2)(A)(i). Second, the Bank maintains that the Plan is unconfirmable because the Plan has not been proposed in good faith as required by § 1129(a)(3). Finally, the Bank maintains that the Plan is not feasible, and thus cannot be confirmed under § 1129(a)(11).

4. This matter was tried to the Court on January 21, 27, and 28, 2014. After taking evidence and hearing argument, the Court took the matter under advisement. We are reconvened this afternoon for the Court's findings of fact, conclusions of law, and ruling.

5. The Debtor's business is the operation of a mechanized car wash in Denver, Colorado, located one block west of Wadsworth on Quincy. It is situated amid other commercial retail establishments including a Costco store and restaurant. The facility features a stainless steel framed, tunnel-type, automated car wash and supporting services consisting of a detail shop and coffee shop. The Debtor's offices are also located on the premises.

6. The Debtor's business location was previously a "Big O" tire store. It was acquired in 2008 for approximately $2.1 million and rebuilt to its present operation. The current operation commenced in March of 2009, to a disappointing start. Its opening had been delayed by construction cost overruns and resolving a dispute with Costco. The Debtor had anticipated being open for the winter months of 2008-2009, the busiest months of what is a seasonal business. Also, between the time this location was acquired and the opening of the Debtor's car wash business, the general economy continued its decline, with a negative impact on the Debtor's early projected revenues.

7. In addition to land and construction costs, Debtor's startup costs included financing of equipment with two equipment lenders. That debt has been paid down to approximately $20,000, with the equipment lenders being provided for in classes 4 and 5 of the Debtor's Plan. The Bank has a junior secured position in the Debtor's equipment.

8. The Debtor's 100% owner, Mike Snow, works on site and oversees the Debtor's operations. Working very long hours, he has supervised employees and been in charge of all aspects of the Debtor's business and operations, from finances, to marketing, to equipment repair. In large part, due to lack of available cash, Mr. Snow has been compensated very modestly for his work for the Debtor, on the order of less than a thousand dollars per month while in Chapter 11. Mr. Snow has supplemented is own income working as a licensed realtor. Mr. Snow has filed his own personal bankruptcy case.

9. Debtor's historic lack of cash from operations has resulted in nonpayment of *ad valorum* real estate taxes. Debtor is in arrears for property taxes through 2012, in an amount of approximately $87,000. Taxes for 2013 will be due in the immediate future in the amount of approximately $30,000. Under its Plan, if confirmed, the Debtor will bring its real estate taxes current and will, under its budget, set aside monthly an amount to cover 2014 taxes when they become due in 2015. Debtor's personal property taxes have been paid current.

10. Maintenance of Debtor's equipment is critical to its operation. Mr. Snow has the skills to, and historically has, overseen maintenance and repair of the Debtor's car wash equipment. The stainless steel frame of the car wash facility requires little maintenance or repair and is expected to last something like 25 years. Subsidiary equipment such as motors, pumps, plumbing and the like require constant maintenance and repair and are budgeted for on a monthly basis.

11. The Bank is the Debtor's principal secured lender. Its predecessor provided the Debtor with its acquisition/construction financing for the car wash. This financing was subsequently converted in 2010 to a term loan. Prior to March of 2011, when Debtor last made any payment on the Bank's loan, Debtor had a history of late payments on the loan from the time after the construction phase of this credit provided for funding of interest.

12. The Debtor and the Bank are in agreement that the amount owed the Bank at the time of Debtor's bankruptcy filing on October 12, 2012, was $3,250,000. The parties have also agreed

that for purposes of the Debtor's plan confirmation effort and the Bank's objection thereto, the value of the Debtor's property is $1.5 million. For purposes of confirmation, the value of the Bank's collateral position – – *i.e.* the portion of its loan that is supported by collateral – – is $1,413,000; that is the stipulated value of the property encumbered by the Bank's trust deed ($1.5 million), less the city's senior statutory property tax lien of $87,000 for back taxes.

13. With respect to its claim, the Bank has made an election under section 1111(b)(2), and thus its entire $3.25 million claim will, for plan confirmation purposes under § 1129, be treated as "an allowed secured claim." Accordingly, for the same purposes, the portion of the Bank's allowed secured claim that is not supported by collateral value is $1,837,000, *i.e.* $3,250,000 less $1,413,000.

14. Before addressing how, in Class 3, the Debtor's Plan proposes to treat the Bank's claim, the Court will first address how 11 U.S.C. section 1111(b)(2) generally applies to a non-assenting secured creditor class, like the Bank, under section 1129(b)(2)(A). First, an electing 1111(b) secured creditor gets no unsecured deficiency claim, but instead treats its entire allowed claim as an allowed secured claim, section 506(a) and its bifurcation process notwithstanding. Next, the 1111(b)(2) electing secured creditor who has voted against the Plan as has the Bank retains its lien as security for its entire allowed secured claim until that claim is paid off. Finally, section 1129(b)(2)(A) mandates, in a situation where the secured claimant like the Bank has voted against the plan, what distributions must be made to the secured claimant in order to satisfy the claim. This distribution mandate is twofold. Distributions must, first, have present value of at least the value of the collateral at the time of confirmation – – $1,413,000 in this case. Secondly, distributions to the 1111(b) electing creditor must in the aggregate add up to a total amount equaling the electing creditor's allowed claim – – $3,250,000 in this case.

15. The first part of this distribution calculation involves present valuing a <u>portion</u> of the distributions to the secured creditor – – typically by distributing over time the amount of the claim that is supported by collateral value at the time of confirmation plus interest at a rate reflecting the time value of money and risk commensurate with the circumstances of the particular debtor's case.

16. The second part of the 1111(b)(2)/1129(b)(2)(A) distribution calculation has nothing to do with present value calculous, time value of money, interest rates or appropriate risk factors for the circumstances. It simply requires that the sum of all distributions to the claimant, whenever made, add up to the total amount of the allowed secured claim, without regard for how much of this amount was supported by collateral value at confirmation and without concern for present value.

17. Until both distribution requirements are satisfied, the 1111(b)(2) electing secured creditor who has voted against a debtor's plan "retains the liens securing such claims," quoting the words of § 1129(b)(A)(i)(I).

18. The rationale for this rather unusual and complex statutory mandate for treatment of an 1111(b)(2) electing secured creditor is apparent from the legislative history of § 1111(b): The electing secured creditor, in exchange for an unsecured deficiency claim which might otherwise

control general unsecured creditor voting, gets the benefit of post-confirmation appreciation of its collateral. In effect, that creditor, by retaining its lien as security for its entire claim, holds that collateral hostage from the debtor's efforts to benefit from that post-confirmation appreciation of collateral until the entire amount of the creditor's claim is paid.

19. Turning next to how the Debtor's Plan treats the Bank's claim. The Bank's total allowed claim is agreed to be $3,250,000. The collateral is agreed to be worth $1,500,000. The portion of the $3,250,000 claim supported by collateral value is $1,413,000, or $1.5 million less the senior property tax lien of $87,000. As the first part of the Plan's distributions to the Bank, the Debtor proposes to pay $1,413,000 plus annual interest at a rate of 4 to 6% in a stream of monthly payments based on a 20-year amortization with a balloon maturity payment at the end of 5 years. The Bank is to retain its lien on the property. At 4% the monthly payments are $8,574/month with a 5-year balloon payment of $1,157,000. At 6% the monthly payments are $10,123/month, with a 5-year balloon payment of $1,200,000.

20. The second part of the Plan's distributions to the Bank is payable any time or times within the 20 years following the initial balloon payment. This is a fixed amount, that when added to the 60 monthly payments following confirmation and the balloon payment on the portion of the Bank's claim supported by collateral at confirmation, adds up to the $3,250,000 allowed claim of the Bank. If the first portion of the distributions to the Bank accrued interest at 4%, the fixed distribution for the second portion is $1,579,000. If the first portion of the distributions to the Bank accrued interest at 6%, the fixed distribution for the second portion is $1,443,000.

21. The Plan provides that the Bank will retain its lien. However, the Plan provides also that at the time of the 5-year balloon payment on the first portion of the Bank's distributions, the Bank's lien may be subordinated up to the amount of the 5-year balloon payment. This subordination is to facilitate refinancing of the 5-year balloon payment. Evidence presented by both the Debtor and the Bank support the conclusion that such refinancing, with subordination of the Bank's lien, is probably the only way the Debtor might make the 5-year balloon payment called for by the Plan.

22. As noted, the Bank objects to confirmation of the Debtor's Plan on three grounds: § 1129(a)(1), that the Plan fails to comply with Title 11; § 1129(a)(3), that the Plan has not been filed in good faith; and § 1129(a)(11), that carrying out the Plan is not feasible.

23. The Court will first address the Bank's §1129(a)(3) objection that the Debtor's Plan has not been proposed in good faith. The Bank contends that Debtor's Plan has been hopeless from the start, presenting no serious prospect for meeting the terms for a Chapter 11 reorganization. The Bank suggests that the Debtor's Plan is just part of this Debtor's larger effort to delay, rather than to reorganize. The Bank argues that this Plan provides little to creditors and benefits only the Debtor's 100% owner, Mr. Snow.

24. The record before the Court establishes that this case and the Debtor's Plan have been filed in good faith. The Debtor's efforts to reorganize through this Plan in Chapter 11, though

challenging, are not frivolous. The Debtor has diligently prosecuted this case, including good faith negotiations between itself and the Bank. The Debtor has complied with reporting and other responsibilities as a debtor-in-possession. There is no evidence of this Debtor's lack of candor with creditors or the Court. This Plan provides something to general creditors who have little chance of recovery in the absence of plan confirmation. General creditors have in fact voted favorably on this Plan. During the course of this Chapter 11, this Debtor has worked diligently and has modestly improved its operations. The Bank is the only party-in-interest who objects to this Plan. Having made an 1111(b) election, as it is well entitled to, the Bank has raised issues of both law and fact relating to compliance with the statute and feasibility that are both close and complex issues. The Court finds that the Debtor's efforts to confirm the Plan before it are every bit as earnest and in good faith as are the Bank's efforts to defeat this Plan.

25. The Bank maintains that the Plan's treatment of the portion of its $3,250,000 claim that is now supported by collateral value, in the amount of $1,413,000, fails to comply with § 1129(b)(2)(A) because payment of $1,413,000 plus 4 to 6% interest in monthly payments based on a 20-year amortization, with a 5-year balloon, with a borrower in Debtor's circumstances does not have a present value of $1,413,000. The Bank's expert offered his opinion that, in Debtor's circumstances an interest rate of 10% or more would be required on this 5-year stream of monthly payments with 20-year amortization and a 5-year balloon maturity for this part of the proposed Plan's distributions to the Bank to have a present value of $1,413,000, *i.e*. this Bank's collateral value in the Debtor's property today.

26. The Debtor's expert on real estate finance opined that 4% was an appropriate interest rate to be applied to the $1,413,000 to be paid monthly over 5 years with a 20-year amortization and 5-year balloon. This expert's justification of a 4% interest rate was unstated, or at best, unclear.

27. The Bank's expert's theory for how one might assign an appropriate interest rate to a given number – – here $1,413,000 – – so that a 5-year stream of future payments would have the present value of that number, was at least clear. Prime rate of 3.5% over the past couple of years reflects time value of money before adjusting for risk for a given credit. Four risk factors increased the appropriate interest rate: capital structure, nature of collateral, debt service coverage, and term of loan. Applying each of these risk factors to the Debtor and the Plan's proposed treatment of the Bank's claim, the Bank's expert added to the 3.5% prime rate 87 to 300 basis points for each of the four risk factors. While this experts's base rate plus risk factors rationale for selecting an interest rate may be sound, his application of this rationale in the context of this Plan and the Bank's 1111(b) election was fully confused.

Instead of opining on an interest rate over five years for the $1,413,000 portion of the Bank's claim that is backed with collateral value, that the 5-year stream of proposed payments under the circumstances of this Debtor would have present value of $1,413,000, the Bank's expert undertook to present value of the Plan's 25-year stream of payments to be made to the Bank's entire "allowed secured claim," including the $1.4 to $1.5 million balance that could remain for up to 20 years, without accruing interest, after the 5 years of monthly payments and the 5-year balloon.

This misreading of 1111(b) and 1129(b) rendered the Bank's expert's ultimate opinion on interest rates of little use. However, the analysis of factors added on to a base or prime rate was sound and is persuasive that the 6% offered by the Debtor at the high end of the Plan's proposed 4-6% range of interest rates is the best evidence before the Court of an appropriate interest rate to use in arriving at the present value of the initial 5 years of payments to the Bank, including the balloon at the end of 60 months following confirmation.

28. Turning next to the Plan's proposed subordination of the lien to be retained by the Bank pursuant to § 1129(b)(2)(A)(i)(I). Five years after confirmation, the Debtor proposes to pay the balance of the portion of the Bank's total claim that at confirmation was supported by collateral value by refinancing the property in the amount of that 5-year balloon payment. The amount of that balloon payment, after 5 years of monthly payments with a 20-year amortization at 6% interest, would be very close to $1,200,000. To accomplish this refinance, the proposed Plan permits the Debtor to subordinate, to a maximum amount of the $1,200,000, the lien that is retained for the Bank. The Bank objects, asserting that § 1129(b) permits no such subordination.

29. The Debtor argues that the purpose of retaining the lien where a 1111(b) election has been made is to allow the under-secured creditor, like the Bank, to recover what would otherwise be a deficiency balance of its § 1111(b) "allowed secured claim" when and if there is post-confirmation appreciation of the collateral. The Debtor maintains that this may be accomplished while permitting the retained lien to be subordinated dollar-for-dollar as the 1111(b) electing creditor is paid. So long as the subordinated portion of the lien does not exceed what is paid on the initially collateralized portion of the under-secured creditor's claim, the 1111(b) electing creditor can realize on post-confirmation appreciation of the collateral.

30. This reasoning is flawed and is not supported by the language of § 1129(b). Subordination of the retained lien, as permitted by the Debtor's Plan, threatens to take back from the § 1111(b) electing creditor that which § 1111(b) and § 1129(b) have given to it. After the retained lien is subordinated, the Debtor may default and the senior lienor may have a right to foreclose out the subordinated position. At that point, the § 1111(b) electing creditor would be faced with either (1) losing its claim to future appreciation of the collateral, or (2) taking over the senior position to which it had been subordinated by paying out the very dollars it had previously been paid on its allowed secured claim – – hardly a choice contemplated by sections 1111(b and 1129(b). It is, accordingly, not surprising that § 1129(b)(2)(A)(i)(I) says not a word about subordination of the retained lien it requires to be given to a descenting secured creditor class.

31. The two cases cited by the Bank and the only cases the Court located that have looked at Debtor's efforts to adjust adversely the retained lien of § 1129(b)(2)(A)(i)(I) have rejected these efforts, the practical hardship this may cause a reorganization debtor notwithstanding. Thus, subordination of retained liens to new leases or to partial releases of retained liens commensurate with loan pay downs, in the context of §§ 1111(b) and 1129(b) have been rejected as contrary to the fair and equitable requirements of those statutes. See ***In re EFH Grove Tower Associates***, 105 B.R.

310, 313-14 (Bankr. E.D.N.Car. 1989); *In re Ford Products Corp.*, 159 B.R. 693, 695 (Bankr.S.D.N.Y. 1993).

32. The Court concludes that the provisions in Debtor's proposed Plan allowing subordination of the retained lien in favor of the Bank in order to permit refinancing of the property for payment of the balloon payment due on the Bank's claim at the end of 5 years, is contrary to § 1129(b)(2)(A)(i)(I). The proposed Plan's treatment of the Bank is not "fair and equitable" as required by § 1129(b)(1).

33. The Bank has also objected to the Debtor's proposed Plan for its failure to comply with § 1129(a)(11), the requirement that to be confirmed, execution of the Plan must be feasible. The Bank maintains that the Debtor's 5-year cash flow projections are unrealistic, and that there is not a reasonable probability that the Debtor can make the payments necessary to carry out the Plan.

34. The evidence before the Court supports the Debtor's position that its 5-year cash flow projections are not unrealistic and that Debtor has a viable chance of meeting those projections. The Debtor has cash on hand sufficient to cover payments that are to be made on the Plan's effective date, including bringing all back taxes current. The Bank argues that the Debtor's projected positive cash flow going forward reflects materially better results than the Debtor's most recent twelve month's operating history. The Bank's calculations, however, disregard approximately $30,000 of non-recurrent Chapter 11 expenses and approximately $35,000 of non-recurrent principal repayments on equipment financing. Furthermore, the Bank's projections double count amounts required for property taxes going forward. Debtor's business has demonstrated a modest increase in revenues in recent months. Debtor's increase in future revenue projections is conservative, averaging 3.3% annually over the next 5 years. The Court finds that the Debtor's operating projections under the Plan are, in fact, feasible and realistic.

35. This does not, however, overcome the Bank's § 1129(a)(11) feasibility objection. The Court has concluded that the Debtor may not, over the Bank's objection, require subordination of the Bank's retained lien after the proposed 5-year repayment of present value of the portion of the Bank's allowed claim that is now supported by collateral value. Thus, without subordination of the Bank's retained lien, 5 years from now the Debtor would have to sell or refinance the property at the amount of the entire unpaid balance of the Bank's $3,250,000 allowed claim. If the Debtor made payments on the $1,413,000 now supported by collateral value, at 6% interest on a 20-year amortization, the balance at 5 years that would have to be refinanced or paid by sale of the property would be approximately $2,643,000.

36. The Debtor's own expert testified that the Debtor could refinance at the end of 5 years to pay the balance then due on the $1,413,000 of the Bank's allowed claim that was supported by collateral value at confirmation <u>only</u> if the Debtor could then subordinate the lien for the unpaid remainder of the Bank's originally allowed $3.25 million claim.

  37. That conclusion is corroborated by the $1.5 million stipulated current value of the property and the Debtor's own projected net operating income figures. The $1.5 million agreed value of the property is equal to a multiple of 7.56 times Debtor's projected next year's net operating income of $198,300. Debtor's net operating income at 5 years after confirmation is projected to be $247,800. That figure multiplied by 7.56 indicates value of the property 5 years after confirmation of $1,873,000, an amount well insufficient to support sale or refinancing of the property in the amount necessary to then repay the balance of the Bank's claim, 5 years out. Without subordination of the Bank's retained lien, in 5 years, as called for by Debtor's proposed Plan, the proposed Plan is not feasible as is required by § 1129(a)(11).

  38. Upon the foregoing findings of fact and conclusions of law, it is ordered that Debtor's application for confirmation of its Third Amended Plan of Reorganization Dated April 29, 2013, is DENIED, and First Citizens Bank and Trust's Objections thereto are SUSTAINED. Judgment in accordance with these findings, conclusions and ruling will enter forthwith.

DATED: March 20, 2015, *nunc pro tunc* February 18, 2014

               BY THE COURT:

               _____
               A. Bruce Campbell
               United States Bankruptcy Judge